IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, | |
| v. | CRIMINAL ACTION NO.<br>1:21-CR-103-JPB-RDC-03 |
| ISAI BALTAZAR<br>BENITEZ,<br>    Defendant. | |

## <u>FINAL REPORT AND RECOMMENDATION</u>

This case is before the Court on Defendant Isai Baltazar Benitez's Motion to Suppress Statements [Doc. 64] and Motion to Suppress Cell Phone Evidence. [Doc. 63]. This Court held an evidentiary hearing to receive evidence related to these motions on November 3, 2021. (R. 75).  On March 1, 2022, Mr. Benitez filed his post-hearing brief. [Doc. 92]. The Government filed its response on April 11, 2022. [Doc. 97].   Mr. Benitez filed a reply brief on April 26, 2022. [Doc. 98]  Following review of Defendant's pleadings, the Government's response, the transcript of the evidentiary hearing [Doc79] (hereafter "Tr.") and the dash cam video of Mr. Benitez's detention [Gov. Ex 1], these matters are now ripe for judicial review.

**Factual and procedural background**

Mr. Benitez, along with co-conspirators Nereo Valencia Santos and Luis Mojica Garcia, has been named in a two-count Indictment charging him with possession with intent distribute at least 50 grams of methamphetamine in violation of 21 U.S.C. §§841 (b)(1)(A) and 846 (Count 1) and attempting to possess with intent to distribute at least 50 grams of methamphetamine in violation of 21 U.S.C. §§ 841(b)(1)(A) and 846 (Count 2) on about January 27, 2021. [Doc. 26]. The Indictment also contains a provision seeking forfeiture of more than $100,000 seized from the conspirators. [*Id*.].

The charges described in this Indictment arise from a narcotics investigation conducted by federal agents with the Drug Enforcement Administration ("DEA") and local law enforcement officers. (Tr. at 6-7). DEA Special Agent Justin Clutter testified that federal agents intercepted a parcel that had been shipped through the mail. (Tr. at 7). They confirmed that the parcel contained three kilograms of methamphetamine. (*Id*.). The agents removed the narcotics and resealed the parcel in order to conduct a controlled delivery. (*Id*.).

Officers delivered the parcel to the address listed on the label, surveilling the residence to observe who would receive the package. (Tr. at 7-8). While monitoring the residence, the officers observed Mr. Garcia take control of the parcel and depart

2

the area. (*Id*.).   A state law enforcement officer conducted a traffic stop of Mr.

Garcia's vehicle. (Tr. at 8).   He was questioned about the parcel and his destination.

(*Id*.). He revealed that he was driving to a gas station to deliver the parcel to Mr.

Santos. (*Id*. at 7-8).

   The officers proceeded to the gas station where they encountered Mr. Santos.

(Tr. at 8).   Mr. Santos agreed to cooperate and informed the officers that he was

waiting at the gas station for delivery of the parcel containing methamphetamine. (*Id*)

He explained that he planned to distribute two of the three kilograms of

methamphetamine to a person driving a red Dodge Durango. (*Id*.). That person would

be waiting in a nearby parking lot for the delivery.(*Id*.).   Mr. Santos was transported

to the area where the officers expected to locate the third suspect. (Tr. at 19).

   Task Force Officer ("TFO") David Whitefield's dash cam recorded the events

that unfolded as officers contacted the driver of the red Dodge Durango.  (Gov. Ex.

1). The officers identified themselves and ordered the driver, the only occupant, to

exit the vehicle. (Gov. Ex. 1 at 0:20-0:40).   The driver, later identified as Mr. Benitez,

was ordered to place his hands on the hood of a police vehicle where he was frisked

for weapons and contraband. (*Id*.).   None were found.   Once officers confirmed Mr.

Benitez was unarmed, they began to ask him questions regarding his identification,

whether he had a driver's license, where he was going and why. (*Id*. at 0:55-1:05).

When officers began to question Mr. Benitez, he stated that he spoke very little English. (Tr. at 23).  Despite this assertion, he was able to answer questions in English such as whether he was in possession of marijuana or cocaine. (*Id.*).  He answered "no" to these questions. (*Id.*).

As the officers were securing the vehicle, TFO Whitehead asked Mr. Benitez if he would give him permission to search his vehicle. (Gov. Ex. 1 at 4:30-5:00).  Mr. Benitez's initial verbal response was not captured on the recording, but this subsequent exchange was:

Q. (TFO Whitehead): Okay.  You give me permission to search that car? And all of the contents?

A.  (Mr. Benitez): Yeah.

Q. (TFO Whitehead): It's okay?

A. (Mr. Benitez): Yeah.

(Gov. Ex. 1 at 4:50) (Tr. at 14).

After obtaining verbal consent to search the vehicle, the officers presented Mr. Benitez with a written consent form to sign. (Tr. at 16-17).  TFO Juan Lopez-Martinez, an officer fluent in English and Spanish, began discussing the form with Mr. Benitez and was present as he reviewed the document. (Tr. at 45).  The form

(written in Spanish) stated that Mr. Benitez was giving his consent to TFO Whitehead and other highway patrol officers to:

> "search the vehicle described as follows, including luggage, containers, and all types of contents…I understand that I have the right to refuse consent to the search described above and to refuse to sign this form.  I, in addition, declare that no promises, threats, force or coercion of any form has been used against me to make me give consent to search the described above or to sign this form."

(Gov. Ex. 2; 2A).

After Mr. Benitez signed the consent form, he continued to answer questions while the officers conducted the search. (Gov. Ex. 1 at 11:30-1:20).  During the search, two cellphones were discovered. (Tr. at 17).  Agent Clutter testified that he instructed Mr. Santos to dial the number belonging to the person he planned to meet in the parking lot. (Tr. at 28). One of the cellphones, a "flip" phone, began to ring. (*Id.*). Agent Clutter opened the phone and saw a number displayed along with the name "Primo." (*Id.*).  He showed the phone to Mr. Benitez and asked him to identify the caller.  Mr. Benitez stated that the number belonged to his cousin - Mr. Santos. (Gov. Ex. 1 at 14:40).

As the officers were completing their search, Mr. Benitez conversed (in English) with one of the officers about the nature of his employment and his children. (Gov. Ex. 1 at 11:30-12:10).  He was not handcuffed at that time. All of the questions

posed to Mr. Benitez occurred during a period spanning approximately 15 minutes. (*Id*. at 12; 34.)  Meanwhile, Mr. Santos explained to the officers that he was supposed to deliver the methamphetamine to Mr. Benitez who would later return to the parking lot with the money. (Tr. at 12).

Before the search was completed, Mr. Benitez was moved to an area of the parking lot that was outside of the view of the dash cam.[1]  TFO Lopez-Martinez testified that it was then that he read the *Miranda* warnings to Mr. Benitez from DEA

---

[1]  Mr. Benitez argues that the officers' testimony regarding the location of this interview is unreliable because Agent Clutter testified that Mr. Benitez was moved to avoid the rain (Tr. at 29; 50), whereas TFO Lopez Martinez stated that he believed Mr. Benitez was relocated to avoid any contact with Mr. Santos. [Doc. 92 at 5-6]. These contradictions, Mr. Benitez submits, undermine the officers' credibility and supports his contention that the *Miranda* warnings were never recited. [Doc 98 at 7]. The Government asks that this Court credit the officers' consistent testimony that the *Miranda* warnings were read. [Doc. 97 at 10].

The Eleventh Circuit has held that credibility determinations "are typically the province of the fact finder because the fact finder personally observes the testimony and is thus in a better position than a reviewing court to assess the credibility of witnesses." *United States v. Ramirez-Chilel*, 289 F.3d 744, 747 (11th Cir. 2002); *Viehman v. Schweiker*, 679 F.2d 223, 227-28 (11th Cir. 1982). Upon careful review of the officers' testimony and this Court's observation of their demeanor during the evidentiary hearing, the undersigned finds they were credible witnesses and that their recollections of the events that occurred more than a year ago were reliable. See also, *United States v. Yusuff,* 96 F.3d 982, 986 (7th Cir. 1996)"[M]inor inconsistencies in the police [officers' testimonies] do not undermine their credibility in any significant fashion.").  Moreover, even if the officers did not recite the *Miranda* warnings at that time, that omission would be of no consequence because no incriminating statements were obtained during that interview.

Form 13A. (Tr. at 39-40).[2]   Agent Clutter was also present as these warnings were recited. (Tr. at 23).  According to the officers, Mr. Benitez stated that he did nothing wrong and did not want to answer any additional questions. (*Id.* at 30).  TFO Lopez-Martinez testified that neither he nor any other officers ever threatened Mr. Benitez or coerced him to speak. (Tr. at 41-42).

The only items of evidentiary value seized from the vehicle were the two cellphones. No narcotics, large sums of money or drug-related paraphernalia were discovered. (Tr. at  31).

## The parties' contentions

Mr. Benitez's motions seek to suppress his statements and evidence obtained from the warrantless search of his flip phone. He submits that the statements made in response to the officers' questions  should be suppressed because (1) they were not made knowingly or voluntarily and (2) the officers failed to advise him of his *Miranda*

---

[2]     The waiver of rights form (written in English and Spanish) read by TFO Lopez-Martinez states: "Before we ask you any questions, you must understand: You have the right to remain silent. Anything you say can be used against you in court. You have the right to talk to a lawyer for advice before we ask you any questions and to have a lawyer with you during questioning.  If you cannot afford a lawyer, one will be appointed for you before any questioning if you wish. Do you understand? Are you willing to answer some questions?" (Gov. Ex. 3).

rights after he was detained. [Doc. 92 at 3].   He asserts that he was "struggling with a language barrier during most of his conversations with law enforcement" which undermines any claim that he knowingly consented to a warrantless search of his vehicle. [*Id.* at 13]. He also claims that he "was not free to leave" after law enforcement officers ordered him to exit his vehicle and remain near their patrol cars as his Dodge Durango was searched.   Because he submits he was "in custody" as officers asked several questions regarding his alleged involvement in the conspiracy prior to recitation of the *Miranda* warnings, his statements must be suppressed. [*Id.* at 18-19].

As for the evidence obtained from his cellphone, Mr. Benitez avers that the warrantless search of his vehicle and its contents was unlawful because he did not voluntarily consent to the search but rather "acquiesced to a claim of lawful authority." [Doc. 92 at 3].   He also submits that the consent he allegedly provided did not include a warrantless search of his cellphone, that no exigent circumstances justified the warrantless search,  that a search was unconstitutional as a matter of law pursuant to *Riley v. California*, 573 U.S. 373 (2014), that the search warrant subsequently obtained for the cellphones was not supported by probable cause "independent of any information obtained during an initial illegal search" and  failed to sufficiently particularize the scope of the authorized search. [*Id.* at 9]

The Government asserts that these claims are meritless, arguing that Mr. Benitez's statements were lawfully obtained because he was not "in custody" when he was questioned, a condition precedent to an officer's duty to recite the *Miranda* warnings. [Doc. 97 at 10-11]. It submits that the totality of the circumstances, including the fact that Mr. Benitez was detained in a public area, was not handcuffed or restrained, and participated in a cordial conversation with officers as they searched his vehicle establishes that he was not "in custody" for purposes of *Miranda*. [*Id.* at 11-12].

It also asserts that the Motion to Suppress Cellphone Evidence should be denied because Mr. Benitez voluntarily consented to a search of his vehicle and all of its contents, verbally and in writing. [*Id.* at 5]. Furthermore, the Government claims that the warrantless search of the flip phone would have been lawful even without Mr. Benitez's consent pursuant to the "automobile exception" because "the [officers had] probable cause to believe the container [held] evidence of a crime." [Doc. 97 at 7]. Lastly, it submits that the search will survive this constitutional challenge because the search warrant subsequently obtained was supported by probable cause and that Attachment B precisely limited the scope of the search to information that related to the investigation of federal narcotics offenses. [*Id.* at 8-9].

In response, Mr. Benitez reiterates that the warrantless search of his cellphone is proscribed by the Supreme Court's decision in *Riley.* [Doc. 98 at 3].  He also argues that the consent form authorizing the search of  "containers" did not include cellphones because the officers were only intending to search "anything that can be used to hide contraband.  That would be drugs, guns, large sums of money, anything that you can use." [*Id.* at 5]. Additionally, he avers that the Government cannot rely on the search warrant to avoid suppression of the cellphone evidence because "there must be probable cause that the phone contained evidence of a crime. However, there was not evidence of [his] involvement in drug dealing before the warrantless search of his phone." [Doc. 98 at 6].

Finally, Mr. Benitez states that he "does not concede" that officers read the *Miranda* warnings. [Doc. 98 at 6].  He notes that the Government's witnesses admitted that the warnings were not read until approximately 15 minutes after he was detained, a period during which he was asked questions concerning whether he possessed contraband, why he was not at work, why he was waiting in the parking lot and whether he would provide more information concerning "Primo."  [*Id.* at 7]. These questions, coupled with his claim that "it is undisputed that the officers did not read him his *Miranda* rights during this time period," support his argument that his statements must be suppressed. [*Id.*].

## (I) Mr. Benitez's *Miranda* rights were not violated

Before the Government is permitted to introduce a suspect's uncounseled statement made during custodial interrogation, it must show that the suspect made a voluntary, knowing and intelligent waiver of his privilege against self-incrimination and his right to counsel. *Miranda v. Arizona*, 384 U.S. 436 (1966); *Missouri v. Seibert*, 542 U.S. 600, 608 n.1 (2004); *United States v. de la Fuente*, 548 F.2d 528, 533 (5th Cir. 1977) ("[I]f a defendant shows that a confession was obtained while he was under custodial interrogation, the government then has the burden of proving that the defendant voluntarily waived his privilege against self-incrimination"); [3] *United States v. Bengivenga*, 845 F.2d 593, 596 (5th Cir.1988); *Dunkins v. Thigpen,* 854 F.2d 394, 398 (11th Cir. 1988).  This showing has two distinct aspects: (1) relinquishment of the right must have been the product of a suspect's free and deliberate choice (rather than intimidation, coercion, or deception), and (2) waiver must have been made with the full awareness of both the rights being abandoned and the consequences of the decision to abandon those rights. *Dunkins*, 854 F.2d at 398 (citing *Moran v Burdine*, 475 U.S. 412 (1986)); See, *Edwards v. Arizona*, 451 U.S. 477, 482 (1981)(it is

---

[3]   In *Bonner v. City of Prichard*, 661 F.2d 1206 (11th Cir. 1981) (*en banc*), the Eleventh Circuit adopted as binding precedent all decisions rendered by the Fifth Circuit before October 1, 1981.

impermissible for authorities "to reinterrogate an accused in custody if he has clearly asserted his right to counsel").

The right to *Miranda* warnings only attaches when a custodial interrogation begins. *Miranda*, 384 U.S. at 479.  This Court could conclude that a suspect was subjected to a custodial interrogation if "under the totality of the circumstances,  a reasonable man in the suspect's position would feel a restraint on his freedom of movement to such an extent that he would not feel free to leave." *United States v. Brown*, 441 F.3d 1330, 1347 (11th Cir. 2006)(quoting *United States v. McDowell*, 250 F.3d 1354, 1362 (11th Cri. 2001); *United States v. Grimes*, 142 F.3d 1342 (11th Cir. 1998); *United States v. Street*, 472 F.3d 1298, 1310 (11th Cir. 2006)(where the court found *Mirada* warnings only required when there is a restraint on freedom of movement of a degree associated with formal arrest).  This Court employs a two part test to determine whether a suspect is "in custody" for *Miranda* purposes: "first, what were the circumstances surrounding the interrogation; and second, given those circumstances, would a reasonable person have felt he or she was not at liberty to terminate the interrogation and leave." *Thompson v. Keohane,* 516 U.S. 99,100 (1995). This is an objective test; the subjective beliefs of the suspect and the interviewing officers are not relevant to this issue. *Berkemer v. McCarthy, 468 U.S.*

*420, 438-39 (1984).* With these concepts in mind, the undersigned turns to the errors alleged by Mr. Benitez.

In the case at bar, Mr. Benitez avers that all of the statements he made while he was detained at the scene should be suppressed because he was not *Mirandized* despite the fact he was "in custody." He bases this claim on the fact that Agent Clutter testified that he was not free to leave and that he would have prevented Mr. Benitez from leaving the area if he attempted to do so. [Doc. 97 at 3]. He also claims that the presence of at leave six law enforcement officers, surrounding him as they began to ask questions, elevated his detention to a custodial scenario that required recitation of the *Mirada* warnings. [Id.].

The Government disputes this assertion, arguing that the questions posed to Mr. Benitez while he was detained did not constitute a custodial interrogation because he was not handcuffed after he was removed from his vehicle and subsequently engaged in a cordial conversation with the officers. [Doc. 97. at 12].  It also notes that the search was conducted in a neutral location, rather than a police station or inside a police car; a factor that establishes he was not "in custody" for *Miranda* purposes. [Id]. It submits that this scenario, similar to the one the Eleventh Circuit considered in *United States v. Acosta*, 363 F.3d 1141 (11th Cir.2004)(where court found the level of restraint of the defendant – one that allowed him to remain unrestrained in a public

area - did not amount to a custodial event), did not require recitation of the *Miranda* warnings. [Doc. 97 at 12-13].

The Government's arguments are well-taken. Mr. Benitez stood unrestrained as he watched the officers conduct their search. He appears relaxed on the dash cam recording as he discusses his children and details of his work in the construction field. The officers' weapons were holstered and he was never handcuffed. Just as the Court found in *Acosta*, no reasonable person in Mr. Benitez's situation would "have believed that he was utterly at the mercy of the police, away from the protection of any public scrutiny, and had better confess or else." *Acosta,* 363 F.3d at 1150; <u>See also</u>, *United States v. Luna-Encinas,* 603 F.3d 876, 881 (11th Cir. 2010)( "although a reasonable person in the defendant's position may feel constrained not to leave the scene of a police encounter at a particular moment– and thus may be deemed to have been 'seized' by law enforcement – he will not necessarily be considered in 'custody' for Fifth Amendment purposes."). In consideration of the totality of these particular circumstances, Mr. Benitez has failed to establish that he was "in custody" for purposes of *Miranda*. Because he was not in custody, the officers had no obligation to recite the *Miranda* warnings. Therefore, the undersigned recommends that Mr. Benitez's Motion to Suppress Statements [Doc. 64] be **DENIED.**

### (II)   Mr. Benitez's consent to search was knowing and voluntary

To be considered voluntary, a consent to search "must be the product of an essentially free and unconstrained choice." *United States v. Garcia*, 890 F.2d 355, 360 (11th Cir. 1989) )(quoting *Schneckloth v. Bustamonte,* 412 U.S. 218, 222 (1973)); *United States v. Purcell*, 236 F.3d 1274 (11th Cir. 2001)  In order to determine whether a defendant has voluntarily consented to a search of his property, this Court must consider the totality of the circumstances and the following factors: the person's youth, his lack of education, evidence of the person's low intelligence, the existence of advice as to the nature of the constitutional right implicated, the length of detention preceding the request to consent, the nature of prior questioning, the environment and whether any physical punishment was involved. *Schneckloth, at* 412 U.S. at 226.  However, while the Eleventh Circuit has "enumerated a number of (non-exclusive) factors that may bear on the issue of voluntariness, the absence of official coercion is a *sine qua non* of effective consent. . . ."  *United States v. Gonzalez,* 71 F.3d 819, 828 (citations omitted). In other words, courts examine whether the interview was coercive. *United States v. Thompson*, 422 F.3d  1285, 1296 ("Government coercion is a necessary predicate to a finding of involuntariness under the Fifth Amendment."). "'[T]he government bears the burden of proving ... that the consent was not a function of acquiescence to a claim of lawful authority but rather was given freely and

15

voluntarily.'" *United States v. Hildago*, 7 F.3d 1566, 1571 (11th Cir.1993) (quoting *United States v. Blake*, 888 F.2d 785, 798 (11ᵗʰ Cir. 1989)).

In the instant case, Mr. Benitez does not argue that his age, education, or intelligence undermined his ability to voluntarily consent to the search. Furthermore, there has been no allegation that he was physically harmed by the officers. However, he does allege that his limited comprehension of the English language prohibited him from knowingly consenting to the search and understanding that he could refuse to consent.

The Government refutes this assertion, arguing that the record clearly establishes that Mr. Benitez knowingly and voluntarily consented to the search, a choice that was not coerced. This Court agrees. The dash cam recording shows Mr. Benitez conversing in English with at least two of the officers, discussing his employment and his children. Throughout the conversation with the officers, Mr. Benitez is able to effectively communicate with them as he observes the search. Moreover, TFO Lopez-Martinez was present when consent was given and provided translation when Mr. Benitez signed the consent form, a factor that undermines Mr. Benitez's claim that his consent was not knowing. See, *United States v. Guerrero, 296 F. App'x 764, 767 (*11ᵗʰ Cir. 2008*)* (affirming denial of motion to suppress where defendant was presented with a copy of the rights waiver form in Spanish and his

rights were explained to him Spanish); See Also, *United States v. Boon San Chong,* 829 F.2d 1572, 1575 (11th Cir. 1987) (affirming denial of motion to suppress despite a language barrier where the defendant was advised of his rights in English and Chinese).

The same holds true for Mr. Benitez's argument that his decision to consent was not voluntary, but a submission to a claim of lawful authority. [Doc. 92 at 13]. This assertion is not supported by any evidence of the use force or coercion. The dash cam recording shows Mr. Benitez was detained within view of the public for only a few minutes before he granted verbal consent to search his vehicle. Officers were speaking in non-confrontational tones as they inquired about his identification, his employment and his immediate plans; a scenario that does not suggest a coercive environment. *See United States v. Espinosa-Orlando,* 704 F.2d 507, 513 (11th Cir. 1983)( where court found an environment not unduly coercive when the defendant was arrested at gunpoint, was forced to lie on the ground near the roadway, and gave consent while officer's gun was drawn); See Also, *Berkemer v. McCarthy, 468 U.S. 420, 438-39 (1984)* (where Supreme Court found that a public highway setting is generally less coercive than police station). Thus, the undersigned finds that Mr. Benitez made a knowing, reasoned choice, free from coercion or undue influence, when he provided verbal and written consent to search.

### (III)   <u>The warrantless search of the cellphone was not beyond the scope of the general consent provided by Mr. Benitez</u>

The scope of a search based on a defendant's consent may not exceed the scope of that consent. *Florida v. Jimeno*, 500 U.S. 248, 251 (1991). "The scope of a consent search is defined by the scope of actual consent in the same way that the scope of a search based upon a search warrant is defined by the warrant." *United States v. McBean,* 861 F.2d 1570, 1573 (11th Cir.1988) (per curiam). <u>See</u> <u>Also</u>, *Mason v. Pulliam,* 557 F.2d 426, 429 (5th Cir.1977) ("[w]hen the basis for a search or seizure is consent, the government must conform to the limitations placed upon the right granted to search [or] seize"). 'When an individual gives a general statement of consent without express limitations, the scope of a permissible search is not limitless. Rather, it is constrained by the bounds of reasonableness: what a police officer could reasonably interpret the consent to encompass.' "*United States v. Harris,* 928 F.2d 1113, 1117 (11th Cir. 1991)( <u>quoting</u> *United States v. Strickland*, 902 F.2d 937, 94 (11th Cir. 1990). <u>See</u> <u>Also</u>, *Florida v. Jimeno, 500 U.S. 248, 251 (1991)*("The standard for measuring the scope of a suspect's consent ... is that of 'objective' reasonableness—what would the typical reasonable person have understood by the exchange between the officer and the suspect?").

To ascertain what conduct is within the "bounds of reasonableness," this Court must consider what the parties knew to be the object of the search. *United States v. Martinez,* 949 F.2d  1117, 1119 (11th Cir. 1992)*.* A general consent to search for specific items includes consent to search any compartment or container that might reasonably contain those items. *Id*. at 1120. Permission to search a specific area for narcotics, for example, may be construed as permission to search any compartment or container within the specified area where narcotics may be found. *Id.*  But general permission to search would not include permission to inflict intentional damage to the places or things to be searched. See, *Strickland*, 902 F.2d at 941-42 (the defendant's permission to search automobile for contraband could not reasonably be construed to include permission to slash his spare tire). In order to establish that the warrantless search was conducted  pursuant to the defendant's voluntary consent, the Government must show not only that the consent was obtained without coercion but also that the search conducted was within the purview of the consent received. *Id.*

Mr. Benitez argues that the warrantless search was unconstitutional because "the language of the consent form and Agent's Martinez's interpretation of the form do not support the notion that [he] consented to the search of the phone". [Doc. 92 at 11].  He bases this argument on the Agent's testimony where he explained that the consent form covered: " anything that can be used to hide contraband.  That would be

19

drugs, guns, large sums of money, anything that you can use" (Tr. at 47) and the Supreme Court's decision in *Riley*.

The Government disagrees, noting that Mr. Benitez agreed to allow officers to search this vehicle - verbally and in writing - for "all types of contents" (Gov. Ex. 2A) found therein. It also submits that Mr. Benitez's reliance on *Riley* is misplaced because it is factually inapposite.

This Court agrees. Mr. Benitez knew that the objects of the officers' search included narcotics, weapons, money and any objects that could contain that contraband. He also knew that he agreed to allow the officers to search **all of the contents of his vehicle**. As a result, the officer's search of the flip phone was not beyond the "bounds of reasonableness" or what the parties knew to be the subject of the search. In addition, the *Riley* decision does not demand a different conclusion because it involved a search incident to arrest, not a circumstance involving a defendant's uncoerced decision to allow a warrantless search of all of the contents of his vehicle. Accordingly, this Court rejects Mr. Benitez's argument that officers exceeded the scope of the consent he voluntarily provided.

### (IV)  The search warrant affidavit was supported by probable cause

> The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the

place to be searched, and the persons or things to be seized.

U.S. Const. amend. IV.

"The Fourth Amendment requires that a search warrant be issued only when there is probable cause to believe that an offense has been committed and that evidence exists at the place for which the warrant is requested." United States v. Betancourt, 734 F.2d 750 (11th Cir. 1984). The defendant bears the burden of establishing that a warrant was defective or executed improperly. *Id.*; *United States v. Van Horn*, 789 F.2d 1492, 1500 (11th Cir. 1986); *United States v. Osborne*, 630 F.2d 374, 377 (5th Cir. 1980).

Search warrants are presumed to be validly issued. *Franks v. Delaware*, 438 U.S. 154, 171 (1978). Whether a search warrant affidavit establishes probable cause is a question of law. *United States v. Miller*, 24 F.3d 1357, 1360 (11th Cir. 1994). Probable cause to support the issuance of a search warrant exists when the totality of the circumstances allow a conclusion that there is a fair probability of finding contraband or evidence at a particular location. See ,*United States v. Noriega*, 676 F.3d 1252, 1261 (11th Cir. 2012); *United States v. Kapordelis*, 569 F.3d 1291, 1310 (11th Cir. 2009); *United States v. Gonzalez*, 940 F.2d 1413, 1419 (11th Cir. 1991). Further, "[P]robable cause is a fluid concept--turning on the assessment of probabilities in particular factual contexts[.]" *Illinois v. Gates*, 462 U.S. 213, 232 (1983); *United*

*States v. Brundidge*, 170 F.3d 1350, 1352 (11th Cir. 1999). "[P]robable cause deals 'with probabilities. These are not technical; they are the factual and practical considerations of everyday life on which reasonable and prudent men, not legal technicians, act.'" *Gates*, 462 U.S. at 241 (quoting *Brinegar v. United States*, 338 U.S. 160, 175 (1949)). Moreover, "[p]robable cause does not require overwhelmingly convincing evidence, but only 'reasonably trustworthy information.'" *United States v. Angulo-Hurtado*, 165 F. Supp. 2d 1363, 1376 (N.D. Ga. 2001) (quoting *Ortega v. Christian*, 85 F.3d 1521, 1524 (11th Cir. 1996)). Yet, an affidavit will be found deficient if it contains merely conclusory allegations and fails to provide sufficient information in order for the judge to conclude "that evidence or contraband will probably be found at the premises to be searched." *United States v. Martin*, 297 F.3d 1308, 1314 (11th Cir. 2002) (internal quotation marks omitted); *Gates*, 462 U.S. at 239 ("Sufficient information must be presented to the magistrate to allow that official to determine probable cause; his action cannot be a mere ratification of the bare conclusions of others. In order to ensure that such an abdication of the magistrate's duty does not occur, courts must continue to conscientiously review the sufficiency of affidavits on which warrants are issued.").

In deciding whether to issue a search warrant, the issuing judge may rely upon the opinions and conclusions of an experienced law enforcement agent-affiant, *United*

*States v. Robinson*, 62 F.3d 1325, 1331 n. 9 (11th Cir. 1995), since "[c]onduct innocent in the eyes of the untrained may carry entirely different 'messages' to the experienced or trained observer." *United States v. Gonzalez*, 969 F.2d 999, 1004 (11th Cir. 1992) (quoting *United States v. Fouche*, 776 F.2d 1398, 1403-04 (9th Cir. 1985)); *see also United States v. Kirk*, 781 F.2d 1498, 1505 (11th Cir. 1986) ("Observations of fellow officers of the Government engaged in a common investigation are plainly a reliable basis for a warrant applied for by one of their number.") (citations omitted).

To justify a search, the circumstances must indicate why evidence of the alleged illegal activity will likely be found in a particular place. *Gates*, 462 U.S. at 238; *Warden v. Hayden*, 387 U.S. 294, 307 (1967); *United States v. Griffin*, 555 F.2d 1323, 1325 (5th Cir. 1977). An affidavit therefore "must establish a nexus between the place to be searched and things to be seized, such that there is a substantial basis to believe that the things to be seized will be found in the place searched." *Ellison v. Balinski*, 625 F.3d 953, 958 (6th Cir. 2010). Further, "the nexus between the objects to be seized and the premises searched can be established from the particular circumstances involved and need not rest on direct observation." *United States v. Lockett*, 674 F.2d 843, 846 (11th Cir. 1982).

Finally, "probable cause must exist when the magistrate judge issues the search warrant," *United States v. Santa*, 236 F.3d 662, 672 (11th Cir. 2000) (quoting *United*

23

*States v. Harris*, 20 F.3d 445, 450 (11ᵗʰ Cir. 1994)); because a search is not to be made legal by the evidence that is discovered. *United States v. Di Re*, 332 U.S. 581, 595 (1948).

In the case at bar, Mr. Benitez submits that the affidavit was insufficient because it failed to particularly describe what evidence the officers could seize from cellphones and failed to establish a nexus between Mr. Benitez's cellphones and the conspiracy the officers were investigating prior to his arrest. [Doc. 92 at 15]. The Government disagrees, contending that Attachment B to the warrant application "precisely limits" the search to information related to the investigation into the alleged narcotics conspiracy. [Doc. 97 at 9]. It also argues that the Affiant's factual basis in support of the warrant application was supported by probable case. Again, this Court finds the Government's arguments persuasive.

To begin, the Affiant described her extensive experience in conducting narcotics investigations and the routine utilization of electronic devices by those involved in drug trafficking activity, explaining that:

> In my experience, drug traffickers and money launderers often obtain cellular telephones in fictitious names and/or the names of third parties in an effort to conceal their activities from law enforcement. Drug traffickers and money launders also often use multiple telephones in an effort to compartmentalize their activities. I am also familiar with the ways in which drug traffickers conceal, convert, transmit, and transport their drug proceeds, including, but not limited to, the use of couriers to transport currency and

proceeds, the use of third parties and nominees to purchase or to
hold title to assets, and the use of off-shore accounts.

[Doc. 97-1 at 3-4].

She also presented a comprehensive summary of the acts preceding Mr.

Benitez's arrest and how the utilization of cellular devises facilitated this narcotics

transaction:

While he was detained by officers, GARCIA sent and received messages on his cell
phone (SUBJECT DEVICE #1) with the individual for whom he was taking the
parcel to 1131 Hacknee Court, Lawrenceville, Georgia…

Investigators approached SANTOS, who acknowledged in a post-*Miranda* interview
that he was supposed to be receiving a shipment of controlled substances from
GARCIA. SANTOS stated he was going to take the drug shipment to a third
individual in exchange for payment…

SANTOS directed law enforcement to a shopping center a short distance from the
gas station as the location he was supposed to meet a third individual with the drug
shipment. SANTOS described the third individual as driving a red Dodge
Durango…

SUBJECT DEVICE #2, iPhone in a clear case, was seized from SANTOS'
person and placed in SSEE M000374487. SUBJECT DEVICE #3, a blue
Motorola cell phone, was seized from SANTOS' vehicle and placed in SSEE
M000374361….

SUBJECT DEVICE #4, a black iPhone in a clear case, was seized from BENITEZ's
vehicle and placed in SSEE M000374360. SUBJECT DEVICE #5, a black flip
phone was also seized from BENITEZ'S vehicle and placed in SSEE M000374486.

(Doc. 97-1 at  7-8].

Thus, the affidavit clearly establishes probable cause that Mr. Benitez was a participant in the conspiracy and a nexus between the cellphones and Mr. Benitez's suspected involvement. <u>See</u>, *Riley*, 573 U.S. at 401. (recognizing that "[c]ell phones have become important tools in facilitating coordination and communication among members of criminal enterprises, and provide valuable incriminating information about dangerous criminals"); <u>See</u> <u>Also</u>, *United States v Henry*, No 1:09-CR-522-1-TCGGGB, 2010 WL 5559207, AT *10 (N.D. Ga. Dec. 7, 2010) (finding officer's affidavit setting forth background information regarding narcotics conspiracy provided probable cause to lawfully search defendant's computer and cell phone).

This Court finds that the scope of the warrant was not unconstitutionally broad. Attachment B provides concise descriptions of the types of information the Affiant seeks related to the pending criminal investigation. [Doc. 97-1]. And it also limits the scope of that search to a defined period of time from October 1, 2020 through January 27, 2021. [Id. at 20-21].

Because the evidence seized from Mr. Benitez's flip phone was not unlawfully obtained, the undersigned's reliance on this evidence to support issuance of the search warrant was not improper. Additionally, because this Court finds that probable cause supported the search warrant, it established a nexus between the alleged criminal activity and the cellphones, and that the scope of the requested search was not overly

broad, an analysis of the applicability of the *Leon* good-faith exception is unwarranted. [4]  Based on these findings, this Court recommends that Mr. Benitez's Motion to Suppress Cell Phone Evidence [Doc. 63] be **DENIED.**

## CONCLUSION

For the reasons stated above, this Court **RECOMMENDS** that Mr. Benitez's Motion to Suppress Statements [Doc. 64] and Motion to Suppress Cell Phone Evidence be **DENIED**. [Doc. 63].  Having now addressed all referred pretrial matters relating to Mr. Benitez and having not been advised of any impediments to the scheduling of a trial as to him, this case is **CERTIFIED READY FOR TRIAL.**

**IT IS SO RECOMMENDED** this 27th day of May, 2022.

_____

REGINA D. CANNON
United States Magistrate Judge

---

[4]  Because the undersigned concludes that the warrant was supported by probable cause, she will not address the Government's alternative defenses based on the "automobile exception" or the "good faith exception". [Doc. 97 at 7;10].

27